ORIGINAL

RECEIVED
AUG 1 0 2007
CLERK, U.S. DISTRICT
ANCHORAGE, ALASKA

1    UNITED STATES DISTRICT COURT

2    FOR THE DISTRICT OF ALASKA

3  UNITED STATES OF AMERICA,    )    Case 3:02-cr-00103-31-HRH
                                )
4                  Plaintiff,   )    Anchorage, Alaska
                                )    Thursday, August 2, 2007
5       vs.                     )    9:35 o'clock a.m.
                                )
6  SANTO BATISTA,               )
                                )    EVIDENTIARY HEARING ON MOTION
7                  Defendant.   )    TO VACATE UNDER 28:2255
   _____)          (DKT 1185)

8

9              **TRANSCRIPT OF PROCEEDINGS**

10      BEFORE THE HONORABLE JOHN D. ROBERTS
              UNITED STATES DISTRICT JUDGE

11

   APPEARANCES:

12

   For the Plaintiff:        THOMAS BRADLEY
13                            Assistant U.S. Attorney
                              U.S. Attorney's Office
14                            222 West 7th Avenue, Box 9, Room 253
                              Anchorage, Alaska  99513-7567
15                            907-271-5071

16 For the Defendant:        G. BLAIR MCCUNE
                              Attorney at Law
17                            425 G Street, Suite 620
                              Anchorage, Alaska  99501
18                            907-644-8568

19 Court Recorder:           SAMANTHA LARK
                              U.S. District Court
20                            222 West 7th Avenue, Box 4
                              Anchorage, Alaska  99513-7564
21                            907-677-6118

22 Interpreter:              CHANDLER THOMPSON (Telephonically)
                              U.S. District Court
23                            Las Cruces, New Mexico
                              505-528-1420

24

25



APPEARANCES (Continued):

Transcription Service:    GAYLENE'S WORD SERVICES
                          M. Gaylene Larrecou
                          7330 Madelynne Dr.
                          Anchorage, Alaska  99504-4659
                          907-338-3936


Proceedings recorded by electronic sound recording; transcript produced by transcription service.

1    **ANCHORAGE, ALASKA - THURSDAY, AUGUST 2, 2007**

2    (Courtroom 6)

3    (9:36:05)

4            THE COURT:  ....is on the telephone, is that

5    correct?

6            THE INTERPRETER:  Yes, sir.

7            THE COURT:  All right.  Am I going to be able to

8    hear his voice or just you, Mr. Thompson?

9            THE INTERPRETER:  It's up to you, Your Honor.  I can

10   do it either way.  You want me to just go ahead and cancel out

11   his voice for the time being and then if anything comes up

12   where you need him, we can get it?

13           THE COURT:  Well, let me ask Mr. McCune.

14           MR. MCCUNE:  It seemed to work pretty well this way

15   last time, Your Honor.  Maybe when Mr. Batista is

16   testifying--I intend to call him as a witness--we could have

17   his voice come over at that time.  Maybe that would be

18   appropriate.  But for the first part of the hearing, just go

19   as we are now.

20           THE COURT:  All right.  The government agree with

21   that?

22           MR. BRADLEY:  That's fine.

23           THE COURT:  All right.  We'll proceed that way.  I

24   would like to -- Mr. Thompson, you've determined that

25   Mr. Batista can hear you.

1          THE INTERPRETER:  I've verified that, yes, Your

2   Honor.

3          THE COURT:  Yes.  This is a hearing on a motion to

4   vacate under 28 USC, Section 2255.  I will ask counsel to

5   remain seated so you'll be closer to the microphone.  And let

6   me hear from defense counsel as to the issue that you intend

7   to present for evidence here this morning.  It's the effective

8   claim on the right to file an appeal --

9          MR. MCCUNE:  That's correct.

10         THE COURT:  -- notice of appeal?

11         MR. MCCUNE:  Yes.  We alleged effective assistance

12  of counsel in failing to file a notice of appeal.

13         THE INTERPRETER:  Can Mr. McCune speak up a little

14  bit, maybe get a little closer to the microphone.

15         MR. MCCUNE:  Sorry.

16         THE INTERPRETER:  Thank you.

17         MR. MCCUNE:  Yes, Your Honor.  The issue before the

18  Court, the one I briefed, is effective assistance of counsel

19  for failure to file a notice of appeal after the sentencing

20  which took place in May, I believe.  I don't -- in 2004.

21         THE COURT:  That is the only issue for evidence this

22  morning.  The other issues are reserved on the pleadings.

23         MR. MCCUNE:  The other issues I did not brief, Your

24  Honor.  At the last hearing, if I recall correctly, Your Honor

25  said that he would -- Your -- the Court would not be taking

1   evidence on those other issues.  The --

2           THE COURT:  I just want to make sure we all agree

3   with that, that that's the procedure here this morning.

4           MR. BRADLEY:  That's my recollection.

5           THE COURT:  So the evidence taken should be limited

6   to the issue at hand.

7           MR. MCCUNE:  That's my intention.

8           THE COURT:  All right.  If counsel are ready to

9   proceed, then I'll ask the defense to go forward.  It's your

10  motion.

11          MR. MCCUNE:  Yes, Your Honor.  I will call Hugh

12  Fleischer as a witness.

13          THE COURT:  Mr. Fleischer, come forward and be sworn

14  by the clerk, please.

15          THE CLERK:  Thank you.

16  **HUGH FLEISCHER, DEFENDANT'S WITNESS, SWORN**

17          THE CLERK:  Thank you.  And, sir, if you can please

18  state your name -- your first and last name and spell your

19  last name for the record.

20          THE WITNESS:  Hugh Fleischer, spelled F as in Frank,

21  l-e-i-s-c-h-e-r.

22          THE CLERK:  Thank you.

23          THE COURT:  You may proceed.

24          MR. MCCUNE:  Yes.

25                        **DIRECT EXAMINATION**

BY MR. MCCUNE:

Q    Mr. Fleischer, did you represent the defendant, Santo
     Batista, in the pretrial and sentencing parts of this
     case?

A    I did.

Q    And did you sign an affidavit concerning your advice to
Mr. Batista about his appellate rights?

A    Yes.

Q    And have you had a chance to review that affidavit?

A    I have.

Q    In the affidavit, you said that you were sure that
Mr. Batista understood that he had waived his appellate rights
in his plea agreement.  Is that still your understanding?

A    There's no question about the fact that there was a
waiver of appellate rights in the plea agreement, and I'm sure
we had that discussion, yes.

Q    In the affidavit, you stated that you did not inform
Mr. Batista that he had a right to appeal, is that correct?
Is that your -- still your understanding?

A    Well, I don't have a specific recollection of the
discussions that I had with Mr. Batista at the sentencing
and -- and immediately thereafter, but I do know that my
practice was to explain to the defendant what the -- the
appeal process was, the fact that there was a waiver, the fact
that the government would normally file a -- a dismissal

1  motion to the Ninth Circuit Court of Appeals if indeed there

2  was an appeal filed, but that, you know, if a -- if a client

3  specifically asked to appeal, having had that full discussion,

4  then I would file the appeal.  That was -- that was my

5  practice, and I did file appeals in other cases.

6  Q    But you have no recollection of having any such

7  discussion with Mr. Batista, is that correct?

8  A    I know that I had a discussion with Mr. Batista from the

9  record.  I've reviewed that, and I -- I did discuss the matter

10  with him post-sentencing, but I don't have any specific

11  recollection of the conversation at this time, no.

12  Q    And we've been over your file.  You didn't take any notes

13  of that conversation, did you?

14  A    Well, I don't -- I -- I haven't been able to locate any

15  notes, but normally I would have in fact made notes of it, but

16  I -- I have not been able to locate any notes of that

17  conversation.

18  Q    And there's no final letter to him -- or a letter to him

19  concerning appeal rights?

20  A    There was no letter regarding appeal rights, that's

21  correct.

22  Q    In the affidavit you said that you don't specifically

23  remember whether Mr. Batista asked about his right to appeal

24  after he was sentenced.  Is that still your understanding?

25  A    That's correct.

1  Q    And also in the affidavit you state that if Mr. Batista

2  had asked about his right to appeal, you would have informed

3  him that he had waived his right to appeal, and is that still

4  your understanding?

5  A    Well, I've, yes, I would've definitely had that

6  discussion with him because that was part of the equation as

7  to whether an appeal could or could not be filed.  There was a

8  waiver of the appeal rights set forth in the plea agreement,

9  and yet there were, during that era, judges specifically

10 requiring an appeal to be filed by counsel.  Judge Singleton

11 specifically did that.  And there were other appeals that were

12 filed by my office on behalf of clients during that same

13 period of time.

14      So the process would've been to have discussed with

15 Mr. Batista the fact that there was a waiver but that there

16 was -- you know, during that period -- I believe it was during

17 that period that the government was required to file an

18 objection within a specific period of time, and failing to do

19 that, an appeal could go forward.  I think that was something

20 that was known at that point, and so there was at least a

21 window of opportunity for an appeal if one was to be filed.

22 Q    But you have no recollection of any discussions

23 concerning an appeal in this case, is that correct?

24 A    That's correct, I don't.

25      MR. MCCUNE:  I have no further questions, Your

Honor.

THE COURT:  The government may cross-examine.

MR. BRADLEY:  Thank you, Your Honor.

**CROSS-EXAMINATION**

BY MR. BRADLEY:

Q    Mr. Fleischer, how long have you been practicing law?

A    I've been practicing law since 1964.

Q    Where all have you practiced?

A    I started my practice in the United States Department of Justice, the --

Q    That's a good place to start.  Where -- what were you doing?

A    I was with the Civil Rights Division.  I was a trial attorney primarily in the Southern United States.  For five years I did that.  And then I moved to Alaska and was the litigation director for the Alaska Legal Services Corporation, and approximately a year or so later, I joined a private firm and practiced for about 20 years with the firm, and then in 1996 went on my own and have been solo practice since then.

Q    Where'd you go to law school?

A    University of Denver Law School.

Q    Uh-huh (affirmative).  What is your experience practicing in the federal court, would you say, since you went -- came to Alaska?  How much time do you spend in state court vis-a-vis federal cases?

1  A    The vast majority of my criminal practice is in federal

2  court, and that's where I spent most of my time in the

3  criminal practice, which is about -- a little more than half

4  of my -- my practice.

5  Q    Can you say how many federal criminal trials you've done?

6  A    More than 10.

7  Q    You've done at least one with me.

8  A    I have.

9  Q    And you've been on the CJA panel, taking appointments in

10  federal criminal cases as well as --

11  A    That's --

12  Q    -- being retained?

13  A    That's -- that's correct, yes.  Been on the CJA panel

14  since about 1996.

15  Q    Do you recall during the imposition of sentence

16  Mr. Batista testifying?

17  A    I do.

18  Q    And that --

19  A    I do remember that.

20  Q    -- one of the discussions that I had with him on cross-

21  examination was that he had met with you many, many times --

22         THE INTERPRETER:  Excuse me.  Could counsel speak a

23  little more slowly and a little more loudly, please?

24         MR. BRADLEY:  Okay.  Sorry.  I was -- I found myself

25  turning my head away from the microphone towards the witness.

1  Let me move them so I can do both.  Is that better?

2          THE INTERPRETER:  That helps a lot.  Thank you.

3          THE COURT:  Re-ask the last question, please, if

4  you -- or go forward with a new one.  Talking about at

5  sentencing?

6          MR. BRADLEY:  That's right.  Thank you, Judge.

7  BY MR. BRADLEY:

8  Q    At sentencing you remember a discussion with Mr. Batista

9  where he recalled having met with you many times prior to the

10 entry of the guilty plea in this case and prior to sentencing.

11 A    I don't remember that specific testimony, but it is a

12 fact that I did -- and I do remember having gone to Seattle to

13 meet with him as well as many times at the jail in Anchorage.

14 Q    Although Mr. Batista is a native Spanish speaker, did you

15 mostly communicate with him in English?

16 A    Yes, mostly.  I think as -- as I vaguely recall, that we

17 may have had an interpreter for the first meeting or two, but

18 I think I determined in the course of that, along with the

19 interpreter, that he was competent in -- enough in English

20 that we could communicate in English and did so.

21 Q    Do you recall the day before imposition of sentence in

22 this case the -- you and I and Mr. Barkeley and the agents in

23 this case sat down for one final meeting with Mr. Batista?

24 A    I remember that, yes.

25 Q    In an attempt to get the whole story?

1  A    Yes.

2  Q    In your experience, is that somewhat extraordinary for

3  the final discussions to be the day before sentencing?

4  A    I think that it's -- that it was extraordinary, yes.

5  It's something that normally would not happen and does no

6  normally happen.

7  Q    Is it fair to say that was a, you know, last-ditch effort

8  on all our parts to see if we could get some cooperation from

9  Mr. Batista so he'd qualify for the safety valve?

10 A    It appeared that way, yes.

11 Q    You explained to Mr. Batista the consequences of

12 mandatory minimum sentences, not necessarily just the

13 Guidelines but the statutory mandatory minimums that applied

14 in his case?

15 A    I did.

16 Q    And the statutory safety valve that was built in that was

17 the only way, absent a downward departure motion from the

18 government based on substantial assistance, that Mr. Batista

19 would be able to be sentenced to less than 10 years?

20 A    I remember that as well, yes.

21 Q    You've testified that there was a -- you know, the

22 standard language in the plea agreement waiving sentencing

23 appeal, correct?

24 A    Correct.

25 Q    Do you recall the testimony at -- or the -- I'm sorry --

1  the statement of Judge Holland at the change of plea hearing

2  on October 21, 2003, where Judge Holland specifically

3  discussed the express provision that "You will not take any

4  appeals.  Do you understand that means you are giving up your

5  right to have another court review my sentencing decisions"?

6  Do you recall that in general?

7  A    I do remember that that's -- that was the normal

8  interchange between the judge and the defendant.

9  Q    Do you recall your client's response was, "I am totally

10 in agreement with having this Court reach the decision that

11 has to do with my case"?

12 A    I don't remember that specifically, but I -- you're

13 reading from the transcript --

14 Q    I -- I am, sir.

15 A    -- I understand, so I will accept that.

16 Q    And I didn't recall the exact words until I read them

17 either.  You do recall that he was -- he understood that.

18 A    Well, I believe so, yes.

19 Q    Just a couple final things with regard to the appeal.

20 You have, I take it from your direct testimony, actually filed

21 notices of appeal at the request of clients in cases where

22 there was a putative appellate waiver in a plea agreement.

23 A    I have.

24 Q    Why?

25 A    Well, certain -- first of all, if a client asks to file

1   an appeal, then that's something that one has to do.   I

2   understand that as a matter of law, but --

3   Q    That's one of the things that you have to do if the

4   client wants to do it.   If the client wants to go to trial,

5   you have to go to trial.

6   A    That's true.

7   Q    If the client wants to testify, he gets to testify.

8   A    That's true as well.

9   Q    And if a client wants to appeal, you have to file a

10  notice of appeal.   Whether or not you think any of those

11  things are a good idea, you have to do what your client wants,

12  at least in -- with respect to certain really important

13  decisions.

14  A    Well, that's certainly correct.

15  Q    And you're familiar with the *Anders* brief, where you'll

16  actually file a brief in a case on appeal where you don't

17  really feel there's any issues that are meritorious on appeal.

18  A    Yes, I am familiar with *Anders* briefs.

19  Q    And in this case, you did not file a notice of appeal.

20  A    I don't -- no, I did not.

21  Q    And you're testimony is that your practice has been that

22  if a client told you, "I want to appeal," you would have filed

23  a notice of appeal in that case even knowing that it would be

24  up to the government to potentially file a motion to dismiss

25  that.

1  A    Well, that's true.  I mean, that was my practice, and

2  that's what I carried out in terms --

3  Q    And sometimes the government wouldn't file a motion to

4  dismiss.

5  A    That happened in -- in one case that I had, I remember

6  specifically.

7  Q    Either because they agreed that you had a point or

8  because they forgot or whatever reason, it's something that

9  can happen.

10  A    Yes.  I had experience with that.

11        MR. BRADLEY:  I don't have any other questions for

12  Mr. Fleischer.

13        THE COURT:  Redirect?

14        MR. MCCUNE:  Yes.

15                    **REDIRECT EXAMINATION**

16  BY MR. MCCUNE:

17  Q    Mr. Fleischer, when we were in the process of going

18  through this affidavit --

19  A    Uh-huh (affirmative).

20  Q    -- do you recall telling me that your practice was to

21  file a notice of appeal even though there was a waiver of

22  notice of appeal in a plea agreement?

23  A    I don't remember our specific discussion, Mr. McCune, but

24  I do know that that was my practice at the time, and it's

25  still a practice, for that matter, but it -- you know, the --

1  obviously the legal rules have changed to a certain extent,

2  but that was my practice during that period of time.

3  Q   Did we go over the affidavit several times?  Did I send

4  you drafts and did you send me drafts back?

5  A   I don't remember that, but I -- I'm not -- I wouldn't

6  oppose that as -- as a process that would've been followed.

7  Q   And I take it you'd be very careful in writing out an

8  affidavit, any affidavit in any case, wouldn't you?

9  A   Well, of course.

10 Q   And you'd want to make sure it was truthful, is that

11 correct?

12 A   Of course.

13 Q   And you'd want to make sure it was complete and gave the

14 whole story, is that correct?

15 A   That's also correct.

16 Q   And you would've asked me questions and gone through a

17 process of formulating what you said in the affidavit, is that

18 fair to say?

19 A   No doubt.

20 Q   And there's nothing in this affidavit concerning your

21 practice of filing a notice of appeal when the plea agreement

22 waives notice of appeal, is there?

23 A   In the affidavit, no, there is not.  No.

24 Q   In fact, on the last paragraph of the affidavit -- maybe

25 I could show you that with the Court's permission.

1          THE COURT:  Yes.  You can show it to Mr. Bradley

2    first.

3          MR. MCCUNE:  I'm sorry, Mr. Bradley.  This is

4    exhibit A, page 2 of 2, to the reply brief.

5          MR. BRADLEY:  I've read it, thanks.

6          THE WITNESS:  Uh-huh (affirmative).

7    BY MR. MCCUNE:

8    Q    In the last sentence of the affidavit, basically you said

9    that you would instruct the client that he had waived his

10   right to appeal.  You don't say anything about further

11   discussions concerning an appeal I would be willing to file an

12   appeal if you instructed me to do so, is that correct?

13   A    That's correct, yeah.

14   Q    Is it your practice in criminal cases to document files

15   and write letters to clients concerning important matters?

16   A    Yes.

17   Q    And Mr. Bradley went over a few important matters in the

18   case, and an appeal is an important matter, isn't it?

19   A    Of course.

20   Q    And there's no notation in the file at all as far as you

21   know concerning Mr. Batista's right to appeal, is there?

22   A    No, there's not.  I haven't been able to locate anything

23   in the file.

24         MR. MCCUNE:  I have no further questions, Your

25   Honor.

1      THE COURT:  Recross?

2      MR. BRADLEY:  No, Your Honor.

3                          **VOIR DIRE**

4  BY THE COURT:

5  Q    Mr. Fleischer, you were asked if you had reviewed your

6  affidavit, which was just given to you --

7  A    Yes.

8  Q    -- to look at before coming here today.  My question is

9  did you review your file in this case before coming to

10 testify?

11 A    I -- no, I did not, Your Honor.  I looked at a response

12 that I had made to the Ninth Circuit Court of Appeals to a pro

13 se letter that Mr. Batista had written to the Court of

14 Appeals, and I looked at that affidavit and -- and one or two

15 other documents that Mr. McCune had, but that was about it, as

16 well as cases that Mr. McCune had referred me to.

17 Q    And what's the time frame for him referring you to

18 certain cases?

19 A    That was during this past week.

20 Q    The affidavit, exhibit A, to the reply brief that as

21 shown to you, was that intended to constitute your entire

22 knowledge or testimony on this matter?

23 A    Well, no, sir, it was not.

24 Q    When you were asked questions on direct examination, I

25 heard something to the effect that post-sentencing, you

1  discussed an appeal with Mr. Batista.

2  A    Well, what I -- my testimony was that I do not have a

3  specific recollection of the discussions that I had but that

4  my practice in all the cases was to discuss, among other

5  things, the appeal or the potential appeal of the case in the

6  District Court.  So I'm sure I would've had that discussion.

7  Q    Would that practice have included having a discussion

8  about an appeal even when the plea agreement contained a

9  waiver of rights to appeal?

10 A    It would.

11 Q    Was it your practice to automatically file a notice of

12 appeal regardless of the client's -- or defendant's

13 instruction to you when there was a plea agreement that

14 contained a waiver of rights to appeal?

15 A    I would say that only in those cases such as before the

16 Honorable Judge Singleton, who as a matter of practice, as I

17 recall, directed defense counsel to file an appeal if the

18 defendant wished to -- to appeal, and -- or -- or I think that

19 he may have actually directed that an appeal be filed on

20 behalf of a defendant.  But otherwise, it was -- it was a

21 discussion that was held with each client.

22 Q    Were you aware of any viable right to appeal -- well, let

23 me rephrase that.  Were you aware of any issue to appeal after

24 the sentencing took place in this case?

25 A    Any issue?  Well, I mean, as I indicated in the course of

1   my testimony, during that period the government had a time

2   frame within which to object to a -- an appeal in a situation

3   where wasn't appeal waiver in the plea agreement, and the --

4   if the government failed to make the timely objection, then

5   the appeal in fact could go forward.  And I had actually had

6   experience with that phenomenon, where the government had

7   indeed failed to make the timely objection and -- and there

8   was an appeal that went forward in a case where there had been

9   a plea agreement and an appeal waiver.

10  Q    Were you cognizant of any claim that could've been

11  brought after sentencing in this case on an appeal, any claim

12  that Mr. Batista might've been able to make that you -- that

13  came to your mind?

14  A    Well, I mean, the fact is we had a full hearing, several

15  hours of hearing before Judge Holland at the sentencing, in

16  which Mr. Batista testified, as well as other matters

17  occurred, and we were asserting that he was entitled as a

18  matter of law to the safety valve which was determined by

19  Judge Holland to not be the case.  I mean, he -- he found that

20  Mr. Batista had not met the requirements of a safety valve so

21  that he was not entitled to it at the conclusion of that

22  hearing.  So it was very much -- we were very much aware of

23  that -- that issue.

24  Q    Based upon your thoughtful reflection in this case, when

25  was the first time you heard anything about Mr. Batista

1  wanting to appeal?

2  A    I think probably it was the letter that he wrote to the

3  Ninth Circuit Court of Appeals, which the Ninth Circuit

4  furnished to me and asked me to respond to, which was in May

5  of -- he wrote the letter in May of 2004, and I responded

6  thereafter.

7  Q    At the sentencing -- at the conclusion of the sentencing

8  hearing, did you believe that the defendant had received the

9  sentence he bargained for as part of the plea agreement?

10  A    Well, I mean, that was what was determined by the judge.

11  It was -- certainly was fought very vigorously on his behalf,

12  but that was the -- that was the sentence that the judge gave,

13  and it was consistent with the plea agreement.

14  Q    During your representation of Mr. Batista, did you ever

15  receive any letter from him addressing taking an appeal?

16  A    Not to my recollection.

17        THE COURT:  Either counsel have any additional

18  questions?  First, Mr. McCune.

19        MR. MCCUNE:  Thank you, Your Honor.

20                    **REDIRECT EXAMINATION**

21  BY MR. MCCUNE:

22  Q    Mr. Fleischer, did you know of any attempts that

23  Mr. Batista made to telephone you after the final conference

24  you had with him?

25  A    I have no recollection of that.  I mean, we have a system

1    at the office to receive calls and including calls from jails,

2    but I don't -- I don't know of any subsequent conversation I

3    had with him by telephone.

4    Q    I showed you your last billing records.

5    A    Uh-huh (affirmative).

6    Q    If you had had a conversation with him by telephone,

7    would you have noted that in your billing records?

8    A    Certainly.

9    Q    And there is nothing after that final conference at the

10   jail that is noted in your billing records, is that fair to

11   say?

12   A    I think that's correct, yes, uh-huh (affirmative).

13   Q    If you were not available, would the calls go through to

14   someone else, or would they just simply be declined if

15   Mr. Batista had made a call from jail?

16   A    Well, we have a voice mail system and had one at that

17   time, and there would've been a record of -- of the call.  And

18   if there had been a call from Mr. Batista, I would've

19   responded.  The -- the only way to respond, of course, is to

20   go to the jail, but I -- I would've done that had he -- had he

21   asked for

22   Q    If he was immediately shipped out of Anchorage down to

23   Sea-Tac or another facility, he would've only been able to

24   make collect calls, is that right?

25   A    Well, I don't -- I don't remember the time frame for the

1  system that went into place, but there was -- at some point

2  back at that time, we had a system through the Public Defender

3  for calls that were able to be made from Sea-Tac to our

4  offices without having to pay for them, but I don't remember

5  what the -- what the actual time frame was for that process to

6  go into effect.

7  Q    You don't know if that was available in 2004, do you?

8  A    I don't know.

9  Q    The manner of the safety valve was contested very

10 thoroughly and vigorously at sentencing, is that fair to say?

11 A    Yes.

12 Q    Absent the waiver of the notice of -- absent the waiver

13 of appeal, is that something you may well have advised him to

14 appeal?

15 A    Well, I mean, the fact is there were -- there were

16 certainly issues regarding the safety valve that we felt

17 were -- had viability, and so I think I probably would have,

18 yes.

19        MR. MCCUNE:  I have no further questions, Your

20 Honor.

21        THE COURT:  Mr. Bradley?

22        MR. BRADLEY:  Just briefly to clarify on

23 transportation issues.

24                    **RECROSS-EXAMINATION**

25 BY MR. BRADLEY:

*Gaylene's Word Services*
*(907) 338-3936*

1  Q    The sentencing took place in Judge Holland's courtroom.

2  A    Correct.

3  Q    Here in this courthouse.

4  A    Yes.

5  Q    And the process for the marshals normally after a court

6  hearing is that the defendant goes back down to the lockup

7  downstairs.

8  A    Right.

9  Q    Are you familiar with the practice if you need to talk to

10 a defendant that they can arrange for that to happen down in

11 those (indiscernible - simultaneous speech) rooms?

12 A    Yes.  In -- in reviewing the records, I believe I did,

13 and normally I would, unless they are -- they are actually

14 immediately shipped over to the jail.

15 Q    And then normally, at least in -- and I'm not asking you

16 to recall what happened in this case, but normally there's

17 a -- somewhat of a delay before someone is sent back to

18 Sea-Tac from Anchorage.

19 A    Normally.  It's a matter -- but it sometimes can range

20 from several days to months.

21 Q    When you were representing Mr. Batista, did he call you,

22 based on your -- either on your recollections or on your

23 billing records, did you receive telephone calls from him from

24 the jail?

25 A    I -- I didn't -- I only looked at one -- at the final

1  several entries, so I don't -- I don't have specific memory of

2  conversations, but I do -- I do remember.  I mean, he was in

3  Sea-Tac prior to the sentencing --

4  Q    Of course.

5  A    -- during the interim period, and I'm sure that there

6  were calls between us during that time.

7  Q    And you can't call him in Sea-Tac.

8  A    No, I could not.

9  Q    So he has to call you.

10 A    He would have to have called me.  And I do remember

11 having gone to Sea-Tac to meet with Mr. Batista and go over

12 files.

13 Q    And your testimony is that there's nothing in your

14 billing records indicating conversations with the defendant in

15 the days subsequent to his sentencing.

16 A    Well, there -- I did confer with him, I'm sure, in the

17 Marshal's office of this building after the sentencing, but I

18 don't believe there were any subsequent meetings with him.

19           MR. BRADLEY:  Very well.  No further questions.

20                            **VOIR DIRE**

21 BY THE COURT:

22 Q    Mr. Fleischer, I'm not clear on your testimony about

23 understanding of any viable issues on the safety valve.  After

24 sentencing, did you have any discussion with Mr. Batista,

25 whether initiated by you or him, regarding the outcome of the

1  safety valve issue and whether he could choose to appeal that?

2  A    Your Honor, I don't -- I don't have specific memory of

3  the discussion, but that was very much on our minds because we

4  had just spent hours before Judge Holland on the issue.  We'd

5  had a hotly debated issue regarding the safety valve before

6  Judge Holland, and he declined to give him the -- the safety

7  valve.  We, of course, as Mr. Bradley's questions elicited,

8  had had a meeting on the day prior to sentencing with

9  Mr. Batista, with government officials, including Mr. Bradley.

10  So we'd been spending a lot of time on those issues and the

11  specific issue of whether he qualified under the safety valve.

12  Q    You indicated you did confer with Mr. Batista in the

13  building after the sentencing.

14  A    Yes, which is certainly my standard practice.

15  Q    If there had been any discussion about appealing the

16  outcome of the safety valve, would you have likely remembered

17  it or made any notation in your file to that effect?

18  A    Well, had there been a discussion of filing an appeal,

19  I -- I would've filed the appeal, number one, had -- had he

20  specifically -- after full discussion of the -- the appellate

21  waiver, the issues that were present, I mean, that was my

22  practice.  So I would've filed the appeal had there been a

23  discussion to that effect.

24  Q    Did Mr. Batista ask you or hint that an appeal should be

25  taken or that he wanted to take an appeal?

1  A    I have no memory of that, Your Honor.  I don't have

2  any -- any memory of his doing so.  What I said to the Ninth

3  Circuit was that I do remember that he had thanked me for what

4  he thought was good representation, basically.

5         THE COURT:  Any other questions before the witness

6  steps down?

7         MR. MCCUNE:  I had just one more question on files,

8  Your Honor, if I might.

9                    **REDIRECT EXAMINATION**

10 BY MR. MCCUNE:

11 Q    Mr. Fleischer, about -- as far as any notations to the

12 file or concerns regarding appellate rights or anything like

13 that, do you remember when -- several months ago when we were

14 trying to get the files together there were -- I asked you if

15 anything was missing from the file.  Do you recall that?

16 A    I remember the discussion, and I remember looking through

17 the closed files, which are in a separate building, for the

18 Batista files and so on.

19 Q    Right.  And you found some additional --

20 A    I -- I did find some of the -- I think I found most of

21 everything, but I -- there may -- there may be something that

22 we still have not located, but I don't know that.

23 Q    Okay.  And you know that we were discussing mostly

24 whether there was any notation in the file concerning

25 appellate rights, is that fair to say?

1  A    Correct.

2  Q    So you did review the file to see if there was any

3  notation on appellate rights at that time, didn't you?

4  A    Well, I -- I mean, I looked for all of the -- the file,

5  everything -- anything and everything that related to

6  Mr. Batista, and I -- I did -- what I located I provided to

7  your office.

8  Q    And I -- just recently I said that you'd have -- I

9  brought the file with me here today and --

10 A    Uh-huh (affirmative).

11 Q    -- we went over at least some of the documents in it.

12 A    We did.

13 Q    And you did not find anything concerning notations of

14 rights to appeal, did you?

15 A    I did not.

16         MR. MCCUNE:  No further questions, Your Honor.

17         THE COURT:  Mr. McCune, are you satisfied that

18 you've asked any question that your client would want you to

19 ask?  In other words, he's not here to confer with you side by

20 side.  Do you need to confer with him before we let

21 Mr. Fleischer step down?

22         MR. MCCUNE:  No, I don't, Your Honor.  We had a good

23 telephone discussion about the case yesterday, so I'm

24 confident we're okay.

25         THE COURT:  Mr. Fleischer, you may step down.  I'll

1　ask that you remain available.  We'll see if there's any

2　further testimony from you.

3　　　　　　THE WITNESS:  Very well.

4　　　　　　THE COURT:  Did you want to call another witness?

5　　　　　　MR. MCCUNE:  Yes, Your Honor.  I'd call Santo

6　Batista, the defendant.

7　　　　　　THE COURT:  I'll have the clerk administer the oath

8　to Mr. Batista.

9　　　　　　THE CLERK:  Sir, if you can raise your right hand.

10　　　　　**SANTO BATISTA, DEFENDANT'S WITNESS, SWORN**

11　　　　　　THE CLERK:  And, sir, if you can please spell your

12　first and last name for the record.

13　　　　　　THE WITNESS:  Santo Angel Batista, S-a-n-t-o, A-n-g-

14　e-l, B-a-t-i-s-t-a.

15　　　　　　THE CLERK:  Thank you.

16　　　　　　THE COURT:  I'm not hearing the Spanish, and my

17　question is whether the Spanish is being recorded as a part of

18　the recorded proceedings of this hearing.  Is that of concern

19　to counsel?

20　　　　　　MR. MCCUNE:  Your Honor, I just think I barely heard

21　Mr. Batista.  Maybe we could just do a sound check.  I think

22　Mister --

23　　　　　　THE INTERPRETER:  I can set it up either way you

24　want.

25　　　　　　THE COURT:  Yes.

1     (Interpreter and defendant speak in Spanish, sound check)

2          THE INTERPRETER:  Did you hear Mr. Batista then?

3          MR. MCCUNE:  Mr. Batista, could you speak up a

4    little bit?

5          THE INTERPRETER:  Well, I can raise the sound, which

6    will probably work better.

7          MR. MCCUNE:  That would be --

8          THE INTERPRETER:  Okay.

9     (Interpreter and defendant speak in Spanish, sound check)

10         THE WITNESS:  Yes, I'm here on the line and I'm

11   listen -- I'm hearing perfectly well.

12         THE INTERPRETER:  Was that audible?

13         THE CLERK:  It was audible.

14         MR. MCCUNE:  Yes, it was, Mr. Thompson.  Thank you.

15         THE COURT:  Yes.

16         THE INTERPRETER:  You're welcome.

17         THE COURT:  Counsel may proceed with his questions.

18                    **DIRECT EXAMINATION**

19   BY MR. MCCUNE:

20   Q    Mr. Batista, do you remember being represented by

21   Mr. Hugh Fleischer in the pretrial and sentencing parts of

22   your case?

23   A    Yes, I do remember.

24   Q    Basically, do you understand why you're here today?  Is

25   it because you believe Mr. Fleischer did not file a notice of

1  appeal in your case?

2  A    I understand perfectly and completely why we're having

3  this hearing.

4  Q    Did you sign a declaration telling the judge what

5  happened about Mr. Batista not filing a notice of appeal?

6            THE INTERPRETER:  I'm sorry.  Could you speak up?

7            MR. MCCUNE:  Did you --

8            THE INTERPRETER:  Could you repeat the question,

9  please, a little bit louder?

10  BY MR. MCCUNE:

11  Q    Did you sign a declaration telling the judge what

12  happened about Mr. Batista [sic] not filing the notice of

13  appeal?

14            THE INTERPRETER:  Mr. Batista not filing the notice

15  of appeal?

16  Q    Excuse me.  Mr. Fleischer not filing the notice of

17  appeal.  I'm very sorry.

18  A    Yes, sir.  If I remember correctly, I did a statement on

19  the 22nd of January 2007.

20  Q    Even though the declaration is in English, did you make

21  sure you understood all of it?

22  A    Yes.  My -- I got the advice of somebody who knows more

23  English than I, and I understood it in its entirety.

24  Q    In the declaration, you say that you instructed

25  Mr. Fleischer to file a notice of appeal immediately after the

1  sentencing.  Could you please tell the judge where this took

2  place, where this conversation took place?

3  A    Okay.  After my sentence, in a cell in the -- in what

4  inmates call the bullpen -- okay, and about 45 minutes after

5  the sentencing I was taken to a small room where I had a

6  conversation with Mr. Fleischer through a mirror.

7  Q    Mr. Batista, please tell the judge what was said in that

8  conversation concerning appeals, to the best of your

9  recollection.

10  A    At that time I then, as soon as Mr. Fleischer came in and

11  he said, "I'm sorry.  I wish that things had gone better,"

12  then I said to Mr. Fleischer, "But you and I had a

13  conversation where you told me that my case had taken a

14  160-degree turn, and I would like at this time that we give --

15  (indiscernible - poor telephonics) say the word appeal because

16  given what you explained to me, I thought that's what we ought

17  to do."

18  Q    Did Mr. Fleischer say anything about waiving your right

19  to appeal?

20  A    When I (indiscernible - poor telephonics) had a

21  conversation with him --

22            MR. MCCUNE:  Mr. Thompson, we're getting --

23  A    -- (indiscernible) why don't we give the advisement of

24  intention to appeal --

25            THE COURT:  Hold up, hold up.

1  A    -- Mr. Fleischer told me after I -- I learned what the

2  word "waive" meant.  But he said to me, "Mr. Batista, you

3  waived your right to appeal."  And at that time I did not know

4  what the word "waive" meant.

5         MR. MCCUNE:  Mr. Thompson, we're getting some other

6  kind of transmission or something while you're talking.

7         Did the Court understand the -- okay.

8         THE COURT:  I'm satisfied, but if you want it

9  repeated, you can ask him.

10        MR. MCCUNE:  No, I just wanted to make sure we're

11 making a sufficient record.

12 BY MR. MCCUNE:

13 Q    After you were transferred -- were you transferred to

14 another jail after that, and if so, when?

15 A    If my memory -- if I remember correctly, I was sentenced

16 on a Wednesday in February, and the following Monday at 2:00

17 in the -- at 2:00 in the morning at the Anchorage jail -- at

18 that time then, at 2:00 in the morning on that Monday, the

19 marshals came around and got me up because they said they were

20 transporting me, and I was -- I wondered why, because as I

21 understood, I was going to have another conversation with

22 Mr. Fleischer.

23 Q    Did you try to telephone Mr. Fleischer from Anchorage or

24 from any other institution?

25 A    It wasn't possible from Anchorage.  I was extremely

1  upset, given the sentence that I'd been given the day before.

2  Q    So you wanted to appeal right from the start, is that

3  fair to say?

4  A    As soon as I had the chance to do so after talking with

5  Mr. Fleischer, I told him -- I let him know that I had the

6  intention to appeal.

7  Q    Did you try to file your own notice of appeal?

8  A    Could you repeat the question?  I didn't understand it

9  clearly.

10  Q    Did you try to file your own notice of appeal at some

11  time?

12  A    Yes, because when I was transferred -- I did file,

13  because when I was transferred to Sea-Tac, I was put in a

14  punishment cell, though I had committed nothing to justify it.

15  Q    Okay.  Mr. Batista, let me go back over that conversation

16  in the bullpen cell.  Do you remember telling Mr. Fleischer

17  that you wanted to file -- wanted him to file a notice of

18  appeal for you, and if so, can you remember the exact language

19  you used?

20  A    I said, "Mr. Fleischer, when you and I talked, my case,

21  according to you, had made a 160-degree turn, and that's not

22  what happened, so I would like to appeal this decision of the

23  court."

24  Q    And what was Mr. Fleischer's response?

25  A    He scratched his head, and as far as what happened -- I'm

1  trying to remember.  He scratched his head and then he said,

2  "I wish that things had worked out better," but then he used

3  that word that said that I waived my right to appeal.

4  Q    Did Mr. Fleischer tell you that he would file an appeal

5  even though you had waived your right?

6  A    At no time I had no conversation with Mr. Fleischer,

7  though I tried to get in touch with him as soon as I was

8  gotten out of the punishment cell.

9  Q    I am asking about the conversation in the punishment

10 [sic] cell.  In -- during that conversation, did Mr. Fleischer

11 say he would file a notice of appeal for you even though you

12 waived your right to appeal?

13 A    At no time did Mr. Fleischer say that he was going to

14 give a notice of appeal on my behalf.

15 Q    Mr. Batista, did Mr. Fleischer have a interpreter during

16 the conversation in the bullpen cell?

17 A    No.  When we were -- he was in the bullpen, no.  He was

18 alone.

19 Q    Were you speaking in English?

20 A    I did -- I asked him to -- we had a conversation, it was

21 in English.  I asked him to speak slowly.  Some of it I

22 understood, some of it I didn't understand.  Sometimes we

23 communicated by gesture.

24 Q    Okay.

25        MR. MCCUNE:  I have no further questions, Your

1  Honor.

2              THE COURT:  Mr. Bradley, you may inquire.

3                        **CROSS-EXAMINATION**

4  BY MR. BRADLEY:

5  Q     Hello, Mr. Batista.

6  A     Good -- good -- good morning, sir.

7  Q     The reason you want to appeal -- or wanted to appeal is

8  because you weren't happy with the sentence of 10 years in

9  prison, is that right?

10 A     No, sir.

11 Q     That's not right?

12 A     No, sir.

13 Q     Then why did you want to appeal?

14 A     Repeat the question for me, please.

15 Q     Why did you want to appeal Judge Holland's sentence?

16 A     I thought that it was a right that I had.

17 Q     Why were you not happy with the sentence?

18 A     I never said that -- that I was unhappy with the

19 sentence.

20 Q     Well, didn't you just say that you were upset when you

21 went down to the bullpen with Mr. Fleischer because you didn't

22 like the fact that you got 10 years in prison?

23 A     No.  After the sentence, what I said was I felt upset

24 because it's 10 years, and at my age of 44 that I was at that

25 time, and I was sick and that everybody knew that, how would

1  you expect me to feel?

2  Q    So you were upset because you got 10 years in prison.

3  A    No, sir.

4  Q    But didn't you just say that that's why you were upset,

5  because how would someone expect you to feel, so I guess I'm

6  having trouble understanding why you were upset if it wasn't

7  because you -- I mean, I would be upset if I just got 10 years

8  in prison; weren't you?

9  A    No, sir, because I knew I had to accept what the Court

10  decided, but I also thought I had a right to appeal.

11  Q    So you weren't upset about the 10-year sentence because

12  you knew that that was probably what was going to happen.

13  A    No, sir.

14  Q    Because at the change of plea, Judge Holland told you

15  that you were going to have to serve a mandatory minimum

16  sentence of 10 years, correct?

17  A    I don't recall Judge Holland telling me I had to do 10

18  years.

19  Q    Do you recall your plea agreement that said that the

20  mandatory minimum sentence was 10 years?

21  A    Please repeat the question for me.  There was a cutoff.

22  Q    Do you remember your written plea agreement, the big,

23  like 30-page document that was explained to you in this case?

24  A    The plea -- well, as I recall the plea agreement, it said

25  something about 87 to 108 months.  I don't remember anything

1  about 10 years ever.

2  Q    And you don't remember when Judge Holland told you in

3  October of 2003 that the maximum sentence was life and that

4  you would be serving a mandatory minimum sentence of 10 years?

5  A    I don't recall that.

6  Q    Do you remember the discussion about the safety valve?

7  A    Yes, sir.

8  Q    And do you recall that the purpose of the safety valve

9  was to make you eligible for a sentence that was less than 10

10 years?

11 A    Yes, sir.

12 Q    Isn't that why we met with you that day before the

13 sentencing, to try and talk about what you knew about drug

14 dealing?

15 A    What day are you referring to?

16 Q    The day before the sentencing in -- would've been

17 February 4th of 2004 when I met with you and Mr. Barkeley and

18 the policeman and Mr. Fleischer here in the courthouse.

19 A    Yes.  I remember everybody talked about the safety valve

20 and some other things.  I don't remember the -- all of it at

21 the moment.

22 Q    Do you remember testifying at your sentencing?

23 A    Do I remember what?

24 Q    Do you remember when you testified during your

25 sentencing?

1  A    Yes, I spoke the day of my sentencing.

2  Q    But you -- you'd swore under oath, and you were asked

3  questions, and do you remember when I cross-examined you and

4  asked you questions?

5  A    Yes, I remember the -- the -- the US -- the assistant US

6  attorney asking questions that day.

7  Q    You'd met with the agents and with me in this case

8  previously, hadn't you?

9  A    Yes, the day previously.

10  Q    And before that, as well.

11  A    As I recall, there were two other times before that that

12  we met.

13  Q    We spoke in English, didn't we?

14  A    We did speak in English, and on one occasion there was

15  some -- a man who showed up with a green uniform, I believe he

16  was from Immigration, and he helped me with Spanish.

17  Q    That's right.  But for the most part, we -- you were able

18  to speak in English.

19  A    Excuse me?

20  Q    For the most part you are able to understand and speak

21  basic English.

22  A    Yes, I do remember talking to this man, and he said that

23  I had to be able to understand, even though I said I had some

24  problems, because, according to him, when he went to my

25  (indiscernible), that he had -- I had spoken English with him.

1   Q     My question is, still, you speak pretty good English and

2   you understand pretty good English, right?

3   A     I wouldn't say quite well.

4   Q     When you went back to Sea-Tac, why did they tell you they

5   put you in a punishment cell?

6   A     Because they didn't have any beds in the general

7   population.

8   Q     Were you able to make phone calls from a punishment cell

9   to your attorney?

10  A     I -- when you're in a punishment cell, you're only

11  allowed to make one call, and I used it to call my wife and

12  tell her where I was.

13  Q     You didn't call your attorney?

14  A     From the punishment cell, no.

15  Q     During the time you were at Sea-Tac before your

16  sentencing, did you call Mr. Fleischer from there?

17        THE INTERPRETER:  Could you repeat -- the defendant

18  said he didn't hear the last part of the question.

19  BY MR. BRADLEY:

20  Q     Did you ever call Mr. Fleischer from Sea-Tac?

21  A     What -- what -- yes, when I got out of the punishment

22  cell, I did attempt to call Mr. Fleischer, but when you make

23  calls from the jail and a mechanical answerer or there is a

24  mechanical response on the other end, it immediately cuts off,

25  so I was unable to leave a message for Mr. Fleischer.

1   Q    I'll try this again.  During the time that you were in
2   Sea-Tac, before your sentencing, did you ever call
3   Mr. Fleischer from jail?
4   A    If I recall, before the sentencing, I spoke with
5   Mr. Fleischer by phone about twice.
6   Q    So you knew how to call him from jail.
7   A    Excuse me?
8   Q    You knew how to call Mr. Fleischer from the jail if you
9   had to.
10  A    Yes, sir.
11  Q    And you called your wife from the jail.
12  A    Yes, sir.
13  Q    Your wife lived in Anchorage.
14  A    Yes, sir.
15  Q    Did you ask her to go tell Mr. Fleischer to appeal your
16  case?
17  A    My wife speaks absolutely no English.
18  Q    So the answer is no?  The answer to my question is no,
19  that you --
20  A    My answer is no in relation to what?
21  Q    Did you ask your wife to go or get a message or
22  communicate with Mr. Fleischer about your appeal?
23  A    No.  I did not ask my wife to get in touch with
24  Mr. Fleischer concerning an appeal.
25  Q    Let's talk about your change of plea.  Remember when you

1  pled guilty in October of 2003 in front of Judge Holland?

2  A    I do remember, yes.

3  Q    Do you remember that you said you understood everything

4  in connection with that hearing?

5       THE INTERPRETER:  Some of the conversation is

6  cutting off.  Could you repeat, please?

7  BY MR. BRADLEY:

8  Q    Do you remember --

9  A    Yes, sir.

10 Q    -- Judge Holland telling you that he would be the person

11 who made the decision on what your sentence was going to be?

12 A    Yes, sir.

13 Q    Do you remember saying, quote, "I am fully in agreement

14 with what you have stated, Your Honor"?

15 A    Yes, sir.

16 Q    Do you remember when Judge Holland told you that you

17 could not withdraw your guilty plea if you didn't like your

18 sentence?

19 A    Yes, I remember Judge Holland telling me that.

20 Q    Do you remember that your response was, "Well, the

21 decision is in your hands, Your Honor"?

22 A    Yes.  I think that was my exact answer.

23 Q    You understood that the final sentence in this case was

24 in Judge Holland's hands.

25 A    As I understood it, it was in the hands of the court.

1    Q    Do you understand that when the judge explained to you
2    that there was a express appeal waiver -- I don't think he
3    used the word "waiver," but he says that "There is an express
4    provision that says you will not take any appeal from my
5    sentencing decision"?  Do you remember that?
6    A    No, I don't remember that.
7    Q    You don't remember responding, "I am totally in agreement
8    with having this Court reach the decision that has to do with
9    my case"?
10   A    That I do recall.
11   Q    And do you recall that your limited exception was to
12   raise questions about whether your plea was voluntary or
13   whether your attorney was effective, but other than that, you
14   were giving up all possibility of having another court review
15   the court's sentencing decisions?
16   A    I don't remember Judge Holland's telling me at any time
17   that I didn't have the right to appeal.
18   Q    You don't remember in response to his question, "Do you
19   understand that, with those two exceptions, you're giving up
20   all possibility of having another court review this Court's
21   sentencing decisions, and saying, 'I will accept the Court's
22   decision fully'?"
23   A    I did say that I -- I would accept the decision of the
24   judge, but I don't recall talk about an appeal at that time.
25   Q    Do you recall in the next statement by the judge when he

1  said, "If you offer me a plea of guilty to one or more of the

2  charges, and if I accept that offer, there is, as a practical

3  matter, no effective appeal from your offer and my acceptance

4  of a plea of guilty.  Is that understood?"

5  A    I don't remember any talk about appeals at any time, sir.

6  Q    You don't remember responding to his question, "Is that

7  understood?" by saying, quote, "Yes, I agree totally and I

8  leave in the hands of this Court the entire decision that has

9  to do with my case"?

10  A    That I do recall.

11         MR. BRADLEY:  I don't have any other questions.

12                   **REDIRECT EXAMINATION**

13  BY MR. MCCUNE:

14  Q    Mr. Batista, this is Blair McCune, and I'll be asking you

15  a couple of questions.  Did you try to -- how many times did

16  you try to call from Sea-Tac after you were sentenced to

17  Mr. Fleischer's office?

18  A    In those 15 to 20 days that I was in Sea-Tac after my

19  sentence, and that's all the time I was there, I recall having

20  attempted to call Mr. Fleischer between three and five times.

21  And from Sea-Tac, I was taken to Oklahoma, and I was taken to

22  a place where all calls had to be collect and they did not

23  give you many chances to make calls.

24  Q    Can you tell the Court what the results of those calls

25  were, what happened when you tried to make the calls from

1  Sea-Tac?

2  A    When I called from Sea-Tac -- when I called from Sea-Tac,

3  all I would get was the first few words of the answering

4  machine, and then there would be a beep, and it would be cut

5  off.

6  Q    So you were not able to leave a message?

7  A    Okay.  So, therefore, from Sea-Tac, unless there was

8  somebody to pick up the phone in Mr. Fleischer's office, it

9  was impossible to get a call through to him.

10 Q    Did you try to get a message to Mr. Fleischer in any

11 other way that you wanted to contact him or have him contact

12 you?

13 A    Okay.  I didn't have the time to do that because aside

14 from the time that I was in the punishment cell, I was sent

15 off to Oklahoma once and for all.

16 Q    When you were -- when Judge Holland was advising you

17 about your rights, you remember him saying that he would be

18 the person who would finally determine your sentence, is that

19 right?

20 A    That's right, sir.

21 Q    But the way you understood that, you thought you'd still

22 have a right to appeal, is that correct?

23 A    Perfectly.

24 Q    When you signed the plea agreement, you knew that there

25 was a mandatory minimum 10-year sentence that you could

1  possibly get, is that right?

2  A    In that contract or plea contract, according to what I

3  knew of English, what it did not say or I heard nothing about

4  10 years.  As I understood it, I was facing 87 to 108 months.

5  That was in case I didn't get the safety valve.

6  Q    Okay.  And when you did not get the safety valve, what

7  did you want to do?

8  A    Once I -- I understood that 100 -- 87 to 180 [sic] months

9  was what I was going to get once we lost the safety valve

10 matter.

11 Q    And what did you want to do after you lost the safety

12 valve?  What did you -- what other course did you want to take

13 as far as legal actions are concerned?

14 A    Make use of my right to appeal.

15      MR. MCCUNE:  I have no further questions, Your

16 Honor.

17      MR. BRADLEY:  Just briefly I want to revisit the

18 issue of the 10 years.

19                     **RECROSS-EXAMINATION**

20 BY MR. BRADLEY:

21 Q    You do not remember Judge Holland telling you that there

22 was a mandatory minimum sentence of 10 years.

23 A    No, sir.

24 Q    Do you recall him talking about your plea agreement and

25 saying, "Your plea agreement contains an estimate that your

1  base offense level under the Guidelines will be 34.  Do you

2  understand that I am not bound to follow that estimate but

3  rather will make my own decision about what the base offense

4  level is in your case?"

5  A    I recall -- yes, I do recall Judge Holland telling me

6  that.

7  Q    And you said, "I am fully in agreement with what you have

8  stated, Your Honor."

9  A    That's what I -- that's what I told the judge at that

10  time.

11  Q    Because you understood that your sentence was up to the

12  judge, not the prosecutor and not you.

13  A    Totally.  I know -- I knew from the outset that my

14  sentence was in the hands of Judge Holland and the court.

15         MR. BRADLEY:  No further questions.

16         THE COURT:  Mr. Batista, this is the Court,

17  Magistrate Judge Roberts, asking you some questions.

18                         **VOIR DIRE**

19  BY THE COURT:

20  Q    Did you attempt to file an appeal to the Ninth Circuit on

21  your own?

22  A    Yes, sir.

23  Q    When was that done?

24  A    Okay.  I did it as soon as I got to Fort Binks.  As soon

25  as I got to Fort Binks, I went to the library and advised

1 myself and counseled myself and acted on the basis of what I

2 understood to be my rights.

3 Q    Did you come to the conclusion that the government had

4 not lived up to its plea bargain?

5 A    Not -- not necessarily that the judge had, but I just

6 felt that I ought to have made use of my right to appeal.

7 Q    What was the issue that you presented in your appeal?

8 A    My principal point was that Mr. Fleischer had

9 underestimated my wish to appeal.

10 Q    Beyond that, what issue did you want to appeal?

11 A    That basically beyond that, some additional issues under

12 2255 that I raised that I don't recall at the moment because I

13 don't have it on-hand.

14 Q    Is your motion to vacate before the Court now attempting

15 to raise the same issues that you presented to the Ninth

16 Circuit earlier in your own appeal?

17 A    I did -- Your Honor, I didn't hear the last part.  There

18 was a cut in the communications.

19 Q    Does your motion to vacate before the Court now seek an

20 opportunity to present the same issues on appeal that were

21 presented to the Ninth Circuit earlier?

22 A    Indeed, of course.

23          THE COURT:  Any other questions by counsel?

24                   **REDIRECT EXAMINATION**

25 BY MR. MCCUNE:

1  Q    Mr. Batista, this is Blair McCune.  When you -- what you

2  were upset about or what you were -- not upset but what you

3  were concerned about after the sentencing was the safety

4  valve, not getting the sentence on the -- not getting the

5  reduced sentence because of the safety valve, is that right?

6  A    Yes, sir.

7  Q    And isn't that what you wanted to appeal at that time,

8  right after you were sentenced?

9  A    Yes, sir.

10        MR. MCCUNE:  Okay.  No further questions, Your

11 Honor.

12                   **RECROSS-EXAMINATION**

13 BY MR. BRADLEY:

14 Q    So I'll go back to the first question I asked you.  The

15 reason you wanted to appeal is because you wanted a sentence

16 that was less than 10 years.

17 A    What are you asking, please?

18 Q    The reason you wanted to appeal your case is because you

19 wanted a sentence that was going to be less than 10 years.

20 A    You could say that.

21        MR. BRADLEY:  That's all.

22        THE COURT:  That completes the testimony of the

23 defendant.  I'll ask if there's any other evidence to be

24 presented by the defense.

25        MR. MCCUNE:  I have nothing further, Your Honor.

1      THE COURT:  Mr. Bradley, any further evidence by the

2  government?

3      MR. BRADLEY:  Nothing, Your Honor.

4      THE COURT:  I would like to hear your arguments on

5  the motion.  Perhaps we could take a brief recess, maybe five

6  minutes, and Mr. Fleischer can be advised that he need not

7  stay, and that will give you a chance to collect your

8  thoughts.

9      So, Mr. Thompson, if you could remain on the line,

10  we'll take a recess for about five minutes.

11      THE INTERPRETER:  That'll be fine, Your Honor.

12      MR. BATISTA:  Okay.

13      THE COURT:  Mr. Batista, keep your line open because

14  the attorneys are going to argue this case in five minutes,

15  so --

16      THE INTERPRETER:  I just told him that, Your Honor.

17      THE COURT:  Thank you.  We'll be in recess for five

18  minutes with an open line to the interpreter.

19      THE CLERK:  All rise.  This matter is now in brief

20  recess.

21      (Court recessed at 10:56:27 a.m., until 11:02:29 a.m.)

22      THE CLERK:  All rise.  His Honor the Court, this

23  United States District Court is again in session.  Please be

24  seated.

25      THE INTERPRETER:  Your Honor?

1     THE COURT:  Yes.

2     THE INTERPRETER:  The case manager would like to

3 speak to you briefly.  He's got some problems there in McRae

4 before we start.

5     THE COURT:  All right.

6     UNIDENTIFIED CORRECTIONS:  Hello?

7     THE COURT:  Hello, yes?

8     UNIDENTIFIED CORRECTIONS:  Yes, sir.  I was just

9 wondering can you give me some kind of time frame on this?  I

10 got -- I'm at the (indiscernible) unit, but they are needing

11 me at the (indiscernible) now.  We've got inmates here -- a

12 few inmates here (indiscernible - simultaneous speech) --

13     THE COURT:  Let me see if I can.

14     Can counsel keep their arguments to about 10 minutes

15 apiece?

16     MR. BRADLEY:  Mine will be five, if that.

17     MR. MCCUNE:  I'll keep it down to five.

18     THE COURT:  All right.  So we're going to hear about

19 10 minutes of argument.

20     UNIDENTIFIED CORRECTIONS:  Okay.  All right.  Okay.

21 I just -- I need to let my people know about how much longer

22 I'll be.

23     THE COURT:  Thank you very much.

24     UNIDENTIFIED CORRECTIONS:  Okay.  I'm going to turn

25 the phone back over to him.

1          THE COURT:  Let me ascertain, then, if we have

2   Mr. Thompson and Mr. Batista on the telephone?

3          THE INTERPRETER:  You do, Your Honor.

4          THE COURT:  All right.  Mr. McCune, go ahead.

5          MR. MCCUNE:  Yes, Your Honor.  The key, I think, the

6   factual key --

7          THE INTERPRETER:  Can Mr. McCune get a little closer

8   to the microphone?  Sorry.

9          MR. MCCUNE:  You bet.  The facts of the case, the

10  key facts of the case concern, I believe, the conversation in

11  the Marshal's office in this building that happened right

12  after the sentencing.  Mr. Batista was reluctant to say he was

13  upset, and maybe that means that -- angry or disturbed.  He --

14  but he was -- felt that the sentence -- the safety valve

15  decision that the court had made was wrong and he wanted to

16  appeal that.  He told Mr. Fleischer he wanted to appeal that.

17  And I believe the facts show that Mr. Fleischer put his hand

18  to his forehead and said, "Mr. Batista, you waived your right

19  to appeal," and that that was a kind of an end-of-story type

20  answer.

21         The law on the case comes from *Roe versus*

22  *Flores-Ortega*, and there's two points that I'd like to make

23  about that case.  One is that there was an earlier case cited

24  in *Roe* called *Rodriguez*, and in *Rodriguez* it says, "We have

25  long held that a lawyer who disregards specific instructions

1   from the defendant to file a notice of appeal acts in a manner

2   that's professionally unreasonable."  So if this Court finds

3   there was an instruction to appeal and not following through

4   on that, then in effective assistance of counsel is made out.

5       *Roe* goes beyond that, though, and sets out the

6   standards.  And last time the Court asked me about whether

7   there was any case law on waivers of right to appeal.  It is

8   addressed, actually, in *Roe*, and the court's decision is

9   basically that "We hold that counsel has a constitutionally

10  imposed duty to consult with a defendant about an appeal and

11  if there is any reason to think either that a rational

12  defendant would want to appeal or that this particular

13  defendant reasonably demonstrated to counsel that he was

14  interested in appealing."  And I think it's an either/or, and

15  number two, I think, fits best to this case.  If not the

16  instruction, then number two on *Roe*.

17      And then farther down it -- *Roe* says, "Even in cases

18  where the defendant pleads guilty, the court must consider

19  such factors as to whether a defendant received -- "

20      THE INTERPRETER:  Where there is what?  I'm sorry.

21  The interpreter did not hear that.

22      MR. MCCUNE:  "Even in cases where the defendant

23  pleads guilty, the court must consider such factors as to

24  whether the defendant received the sentence bargained for and

25  whether the plea expressly reserved or waived some or all

appeal rights." And the way I would read that is even though a sentence waives appeal rights, it -- and if there's an instruction it should be appealed, if there was -- a particular defendant is interested in appealing, it should be appealed.

THE COURT: Focus on the prejudice prong of the *Strickland* test. Assuming arguendo that counsel's ineffective for not filing a notice of appeal, what does this Court review to determine whether there's prejudice?

MR. MCCUNE: The prejudice is inherent because the appeal is an administerial act. If there's no notice of appeal filed, that's enough. We don't have to show that the outcome of the appeal would've been successful in any way.

THE COURT: The issue here he wanted to appeal was the -- I'll just say the abuse of discretion by the district judge in denying a safety valve. That's the sentence. Didn't he waive his right to appeal the sentence received?

MR. MCCUNE: The notice of appeal nonetheless has to be filed. It's an administerial act, and we will argue in the Ninth Circuit whether he gets his right to appeal or whether he waived it.

THE COURT: Let me focus my question again. What review should the District Court make, rather than automatically say ineffective counsel has been shown so it goes to the Ninth Circuit, doesn't the District Court have to

1    find that there's been a showing of prejudice to prevail on

2    the 2255?

3              MR. MCCUNE:  No.  My position is *Roe versus*

4    *Flores-Ortega* holds that there is no showing of prejudice

5    necessary other than failure to file the notice of appeal,

6    because it's an administerial act.

7              THE COURT:  Mr. Bradley?

8              MR. BRADLEY:  Thank you, Your Honor.  I want to

9    touch first on the English issue that came up again today

10   because I think it's probative, and I'll be brief on that

11   issue.

12             The testimony that you have before you would be in

13   the sentencing hearing where John Eckstein of the FBI went on

14   about how he had met with Mr. Batista several times when he

15   arrested him and on several occasions up and to -- including

16   the day before, and had no problem understanding or being

17   understood by Mr. Batista.  And then during my argument to the

18   court, I pointed out that it was sort of a helpful thing that

19   Mr. Batista testified that day because he was evasive and he

20   was deceptive and he was self-serving, and the court

21   essentially found that.  Judge Holland didn't believe him, and

22   Judge Holland didn't give him the safety valve.

23             I think we saw a little bit of that today in the --

24   I mean, there were -- there were certain technical problems

25   with the telephone and the interpreter, but I think that

1  Mr. Batista was somewhat self-serving and evasive.

2          The main point is that Mr. Fleischer is, I think, by

3  all standards sort of the dean of the defense bar in federal

4  court here.  He started out with the Justice Department's

5  Civil Rights Division, which in the mid-'60s was pretty much

6  the first string of federal prosecutors in the country.  He's

7  been here -- he's been practicing for 40 years, and he

8  understood that he has an obligation to file an appeal if the

9  defendant asks for it.  He certainly understood that there was

10 a waiver in this case; he understood that was in the plea

11 agreement; he understand that was in the change of plea.

12 Judge Holland had made that clear, the plea agreement made

13 that clear, even if Mr. Batista says today that he doesn't

14 remember that part, along with not really remembering the

15 10-year part.  But he certainly understood that the waiver was

16 there, and he would have explained that and testified that he

17 did explain that, would've explained that, to Mr. Batista.

18          The thing that's compelling in this case is

19 Mr. Fleischer's testimony here in court was he understood that

20 there was an obligation to file a notice of appeal if the

21 client requested it.  He would certainly include a caveat

22 that, "Hey, you're probably not going to prevail on this, but

23 I'll file it if you want."  That's right along the lines with

24 what every good defense lawyer knows, is you've got to go to

25 trial if the client wants to go to trial, even if you think

1  it's a bad idea.  You've got to let the client testify if he

2  wants to testify, even if you don't think it's really the

3  right thing to do.  And you've got to file a notice of appeal,

4  even if you've waived it.  He understands that, he understood

5  it.  His testimony was that it was his practice to do so.  He

6  didn't recall Mr. Batista telling him, "Hey, go down and file

7  a notice of appeal."  If he had been told that, he would have

8  done it.

9         I think that that's -- you know, he -- he even

10  understood that there was a possibility that the government

11  might not oppose or either a conscious decision that, hey, the

12  waiver wasn't that solid, or sometimes we just get busy and

13  don't make the deadlines.  And he might've had a chance at

14  appealing that abuse of discretion on the safety valve.  He

15  didn't -- the government would submit it was because the

16  defendant didn't make a specific request, the sort of

17  convoluted argument that, well, I couldn't get a phone call to

18  him or I couldn't get someone through to him.  If it was as

19  important to Mr. Batista as he now says it was, he certainly

20  could've found someone to get in touch with his lawyer.  He

21  knew how to call his lawyer from the jail and make contact and

22  let his attorney know what he needed to do.

23         Mr. Fleischer is experienced.  Mr. Fleischer knew

24  what his obligations were.  Mr. Fleischer's testimony was if

25  he had asked me to do it, I would've done it, I didn't do it.

1 The conclusion is that -- and, of course, the burden is on the
2 defendant in this case.

3 Just briefly to the prejudice prong, I think it's
4 certainly -- if Mr. Fleischer was asked to file the appeal and
5 didn't, that's certainly ineffective assistance. As far as
6 whether there's a prejudice, I think the record does show that
7 there was a clear waiver. Judge Holland went over it
8 methodically with every defendant in this case and
9 particularly with Mr. Batista, who I believe had the longest
10 sentencing hearing of any defendant in this 40-plus defendant
11 case, that there was no appeal on the sentence, that it was
12 clear at the change of plea, it was clear at the sentencing,
13 and that if he had filed his notice of appeal, it would've
14 been dismissed by the Ninth Circuit, and if they hadn't
15 dismissed it, that the government would've prevailed on the
16 merits because there -- I mean, there was a clear waiver, and
17 that was understood at the time very clearly by Mr. Batista.
18 It was in writing, it was discussed at length by Judge Holland
19 at the change of plea hearing, and Mr. Batista simply wasn't
20 happen with the 10-year sentence that he received.

21 THE COURT: You obviously disagree with the defense
22 about assuming prejudice in this type of case concerning the
23 issue that would've been appealed.

24 MR. BRADLEY: It seems that the government would've
25 prevailed at the end. You know, I don't think that there's --

1 that there is any showing that his waiver was coerced or that

2 his waiver wasn't appropriate.

3 THE COURT: Well, I'm not asking that question.

4 I'll ask you, what do you think the District Court should do

5 if, assuming if, it finds that the defendant has shown

6 ineffective assistance of counsel by his attorney not filing a

7 notice of appeal to challenge the lack of safety valve?

8 MR. BRADLEY: I think technically, since that was an

9 administerial function, I think it is probably of

10 constitutional proportions, and if the Court were to find

11 that, the Court may be required to find ineffective assistance

12 and allow him the limited relief of filing a notice of appeal

13 at this point.

14 THE COURT: Any reply?

15 MR. MCCUNE: I found the language in *Roe* that

16 applies, Your Honor, if I could read that quickly:

17 "Accordingly, we hold that to show prejudice in these

18 circumstances, a defendant must demonstrate that there is a

19 reasonable probability that, but for counsel's deficient

20 failure to consult with him about an appeal, he would have

21 timely appealed."

22 THE COURT: The matter is submitted. Let me

23 inquire, the transcript of sentencing that was referred to

24 here today, where is that part of the record? It was

25 transcribed, I'm sure, but what is the date of the --

1    MR. BRADLEY:  It was transcribed.  It's --

2    THE COURT:  Is there a docket number?

3    MR. BRADLEY:  No.  There's a --

4    MR. MCCUNE:  Wasn't --

5    MR. BRADLEY:  -- proposed change of plea that's

6 dated October 21, 2003, and there's a imposition of sentence

7 dated February 25, 2004.  These have been transcribed and so

8 therefore are available through the Clerk's Office, and would

9 certainly be no objection from the government for the Court

10 taking judicial notice of its own file in referring to the

11 statements that are in there.  I think certainly if they

12 haven't been made part of the record prior to now, they should

13 be.

14    THE COURT:  And the pro se appeal to the Ninth

15 Circuit, has that been made part of the record here?

16    MR. BRADLEY:  Not by the government, but

17 obviously --

18    MR. MCCUNE:  Yes.

19    MR. BRADLEY:  -- I think it's something the Court

20 should consult with and factor in.

21    MR. MCCUNE:  I have that listed as Docket 1065,

22 filed US District Court May 10, 2004.

23    THE COURT:  Thank you.  Anything else, counsel,

24 before we recess this case?

25    MR. BRADLEY:  Thank you, no, Judge.

1         MR. MCCUNE:  Nothing further, Your Honor.

2         THE COURT:  All right.  The proceeding in this

3  matter is adjourned.  The matter is taken under advisement.  A

4  written recommendation will be sent to both attorneys of

5  record.  We'll be in recess.

6         THE CLERK:  All rise.  This matter is now adjourned.

7  This court now stands in recess until 1:30 p.m.

8      (Proceedings concluded at 11:17:42 a.m.)

9

10                        **CERTIFICATE**

11  I certify that the foregoing is a correct transcript from the
electronic sound recording of the proceedings in the above-
12  entitled matter.

13

14                                         8-9-07

M. Gaylene Larrecou, Transcriber       Date
15  United States Court Approved
AAERT Certified #00285

16

17

18

19

20

21

22

23

24

25

*Gaylene's Word Services*
*(907) 338-3936*

# TABLE OF CONTENTS

EVIDENTIARY HEARING (8/2/07)  . . . . . . . . . . . .  PAGE 3

| WITNESSES<br>FOR THE DEFENDANT: | DIRECT | CROSS | REDIRECT | RECROSS | VOIR<br>DIRE |
|---|---|---|---|---|---|
| Hugh Fleischer | 5 | 9 | 15 | | 18 |
| | | | 21 | 23 | 25 |
| | | | 27 | — | — |
| Santo Angel Batista | 30 | 36 | 44 | 46 | 47 |
| | | | 48 | 49 | — |

CLOSING ARGUMENT ON BEHALF OF DEFENDANT:              PAGE 52

CLOSING ARGUMENT ON BEHALF OF PLAINTIFF:              PAGE 55

REBUTTAL ARGUMENT ON BEHALF OF DEFENDANT:             PAGE 59